ROBERT EDMANDS ET AL. *v.* CUNO, INC.
(SC 17321)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued November 22, 2005—officially released March 21, 2006

*Kenneth A. Votre*, for the appellants (plaintiffs).

*William H. Bright, Jr.*, with whom, on the brief, were *Charles D. Ray* and *Allison A. Wood*, for the appellee (defendant).

*Opinion*

KATZ, J. This action arises from the termination of long-standing distributorship and sales representative agreements between the defendant, CUNO, Inc., and the plaintiffs, Robert Edmands, who filed the action in his name as "doing business as Eastern Filter Sales," and Eastern Filter Sales Company (Eastern). The plaintiffs commenced the action after the defendant gave notice of its intent to terminate the agreements, and the defendant asserted counterclaims relating to the plaintiffs' alleged failure to return or pay for certain products in their possession. The plaintiffs appeal from the judgment of the trial court rendered in favor of the defendant, claiming that the court improperly determined that the plaintiffs could not prevail on their claims alleging: a violation of what is commonly known as the Connecticut Franchise Act (franchise act), specifically, General Statutes § 42-133f; a violation of the Connecticut Unfair Trade Practices Act (CUTPA), specifically, General Statutes § 42-110b; and a breach of the implied covenant of good faith and fair dealing. They also claim that the trial court improperly failed to set aside the verdict in favor of the defendant on its counterclaim alleging breach of contract with respect to Edmands personally and that the court improperly granted the defendant's motion requiring the plaintiffs to disclose assets to secure the judgment. We affirm the judgment of the trial court.

The record reflects the following undisputed facts and procedural history. The defendant is a Connecticut based corporation that designs, manufactures and sells filtration products that are marketed under the defendant's name (CUNO products) and are used by indus-

trial companies for the separation, clarification and purification of fluids and gases. The relationship between the defendant and Eastern began in 1972, when Edmands' father and a business partner, John Stample, entered into agreements with the defendant under which Eastern was designated a sales representative and distributor of CUNO products in Connecticut and specified counties in Western Massachusetts. From almost the inception of the relationship until the time the defendant gave notice of its intent to terminate the agreements, CUNO products represented approximately 93 percent of Eastern's business.

In 1984, Edmands purchased his father's share of the business. That year, Edmands, as president of Eastern, Stample and the defendant executed the four operative agreements in this appeal, which in their essential terms mirrored the 1972 agreements: sales representative and distributorship agreements for the defendant's general filter products division, and sales representative and distributorship agreements for the defendant's microfiltration division. The sales representative agreements governed the plaintiffs' solicitation of orders for CUNO products from customers, for which the defendant, following shipment and billing the order to the customer, paid a commission to the plaintiffs. The distributorship agreements governed the sale of CUNO products from the defendant to the plaintiffs, which the plaintiffs in turn sold to customers from Eastern's inventory. All of the agreements designated the plaintiffs as independent contractors. The agreements were to "continue in force indefinitely, subject to cancellation by either party, at any time and for any reason, upon thirty (30) days' notice in writing to the other party."[1]

---

[1] The termination language cited in the text of the opinion is that set forth in the distributorship agreements. The termination provision in the sales representative agreements was substantively the same, providing: "This agreement shall continue indefinitely, but may be terminated at any time and without cause by either party upon thirty days' written notice to the other."

In 1996, Edmands purchased Stample's share of the business. Between June, 1996, and March, 2000, the defendant sent numerous communications to Edmands expressing concerns principally about the plaintiffs' inability to retain qualified salespersons, but also about disappointing sales results. Thereafter, in a letter dated September 11, 2000, Anthony C. Doina, the defendant's vice president and general manager, informed Edmands that, "[i]n accordance with the requirements of the [1984] agreements, this letter will serve as [sixty] day notice of cancellation without cause of these sales agreements," effective November 10, 2000. Although Doina noted therein that the defendant was not required under the terms of the agreements to provide a reason for the termination, he nonetheless provided the following reasons: First, the defendant had decided that it would be "a better business practice to sell [its] product directly in the market [the plaintiffs] now service"; second, the defendant had been "disappointed in [the plaintiffs'] coverage of the territory," in part because the plaintiffs had been unable "to hire and retain qualified sales people . . . ."

In January, 2001, the plaintiffs filed an ex parte application to enjoin temporarily the defendant's termination of the agreements and a verified six count complaint, seeking, inter alia, a permanent injunction and incidental and punitive damages. The plaintiffs alleged that the parties' relationship was that of franchisor-franchisee, and, accordingly, claimed that the defendant's actions: (1) violated the franchise act by terminating the agreements without proper notice and good cause; (2) violated CUTPA; (3) breached the implied covenant of good faith and fair dealing; and (4) constituted negligence. The plaintiffs also alleged that, as a result of conduct by the defendant before and after it gave notice of its intent to terminate the agreements, the defendant had violated the Connecticut Trade Secrets Act, General

Statutes § 35-50 et seq. (trade secrets act), and tortiously had interfered with legitimate business expectancies.

The trial court, *Pittman, J.,* denied the application for a temporary injunction and ordered a hearing on the request for permanent injunctive relief seeking to bar the defendant from terminating the relationship. At the hearing, pursuant to the parties' stipulation, *Hon. Anthony V. DeMayo,* judge trial referee, limited his consideration to the request for a permanent injunction, leaving the remaining issues to be tried later. In a detailed memorandum of decision, the trial court thereafter concluded: (1) that the relationship between the parties was not that of franchisor-franchisee and thus was not covered by the franchise act; and (2) that, in any event, the defendant had demonstrated the requisite good cause for termination of a franchise agreement. Accordingly, the trial court denied the plaintiffs' request for a permanent injunction.[2]

In July, 2001, the plaintiff filed a claim for a jury trial on all counts. In June, 2003, the defendant filed an amended answer and asserted counterclaims alleging that the plaintiffs' failure either to return or pay for the CUNO products in their possession constituted a breach of contract, unjust enrichment and conversion. In March, 2004, shortly before the jury trial had commenced, the defendant requested a determination that the plaintiffs' counts alleging violations of the trade secrets act and the franchise act must be tried to the court, rather than to the jury.

After the close of evidence, the plaintiffs notified the trial court, *Corradino, J.,* that they were withdrawing the negligence and trade secrets act claims, and the defendant similarly notified the court that it was with-

---

[2] The plaintiffs appealed to the Appellate Court from the trial court's decision denying their request for a permanent injunction. The Appellate Court thereafter granted the defendant's motion to dismiss the appeal.

drawing its conversion counterclaim. After these announcements, the trial court reviewed the remaining counts with the parties and discussed at length its doubts as to whether the plaintiffs could prevail on their franchise act claim. Specifically, the court discussed the various elements identified in our case law as relevant to establishing the requisite control by a franchisor and noted that, although the plaintiffs and the defendant regularly had developed a marketing plan, the evidence did not indicate that the defendant actually had exercised control over the plaintiffs' operation of the business under the requisite factors.

The following day, the trial court met with the parties and stated that: (1) the court would decide the franchise act claim; (2) it intended to render judgment for the defendant on that claim; and (3) as a result of the intended decision on the franchise act claim, the defendant was entitled to judgment on the plaintiffs' claims for a violation of CUTPA and for breach of the covenant of good faith and fair dealing.[3] The court explained that it had concluded that the defendant was entitled to judgment on the franchise act claim because the plaintiffs had not met their burden of proving sufficient control by the defendant to establish the necessary management agreement under the franchise act and because the defendant also had established good cause for terminating the agreements in accordance with the franchise act. The court further explained that judgment also must be rendered for the defendant on the CUTPA

---

[3] The trial court began by noting that it already had informed the parties of its decision as to the franchise act. Apparently, that announcement was made in chambers. Thus, because the court's discussion as to these issues was off the record, there is no record as to the impetus for and basis of the trial court's decision to decide the franchise act claim itself, rather than to submit the claim to the jury. Indeed, although the plaintiffs concede that the defendant had raised this issue before the trial commenced, it is not clear from the record or the parties' briefs at what stage in the proceedings the trial court concluded that it would decide the claim.

and fair dealing claims because those claims were predicated on the alleged violation of the franchise act. Accordingly, the trial court rendered partial judgment for the defendant on those three counts. The jury thereafter returned a verdict in favor of the defendant on the plaintiffs' claim of tortious interference with legitimate business expectancies and on the defendant's counterclaim for breach of contract, awarding the defendant $88,716.12 in damages and $26,259.97 in interest. In light of its verdict on the breach of contract counterclaim, the jury did not address the defendant's counterclaim for unjust enrichment.

The plaintiffs thereafter filed motions for reconsideration, to set aside the verdict and for remittitur. The defendant filed an application for prejudgment remedy and a motion for disclosure of assets to secure the judgment. The court denied the plaintiffs' motions and rendered judgment for the defendant in accordance with the jury's verdict. After a hearing, the court subsequently granted the defendant's motion for disclosure of assets, and this appeal followed.[4]

The plaintiffs assert numerous claims of impropriety with respect to the trial court's judgment. With respect to their claims, the plaintiffs contend that the trial court improperly: (1) failed to submit to the jury the claims alleging a violation of the franchise act, a violation of CUTPA and a breach of the implied covenant of good faith and fair dealing; and (2) concluded, with respect to their franchise act claim, that there was no franchise relationship and that the defendant had established good cause for terminating the agreements. With respect to the defendant's counterclaim, the plaintiffs contend that the trial court improperly: (1) denied the

---

[4] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and thereafter we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

plaintiffs' motion to set aside the verdict against Edmands personally; and (2) ordered the plaintiffs to disclose assets to secure the judgment.[5] We reject the plaintiffs' claims.

## I

We begin with the plaintiffs' challenges to the trial court's judgment in favor of the defendant on their claims relating to the franchise act, CUTPA and the implied covenant of good faith and fair dealing. Specifically with respect to the franchise act, the plaintiffs contend that the trial court improperly determined that the court should decide that claim and then further improperly concluded that the plaintiffs had failed to establish that there was a franchise relationship.[6] We address each of these in turn.

[5] The plaintiffs also claim that the trial court improperly: (1) denied their motion to set aside the verdict as to the defendant's counterclaim because the damages were excessive in light of the evidence; and (2) charged the jury on prejudgment interest in light of the evidence. We agree with the defendant that the plaintiffs have failed to brief adequately either of these claims for our review. With respect to both claims, the plaintiffs assert that the jury improperly failed to credit certain testimony, but fail either to identify the source of certain testimony, to provide any citations to the record, to cite any legal authority in support of their claims or to set forth the appropriate standard of review. Indeed, the plaintiffs have offered no response in their reply brief either to the defendant's assertion that these claims have been briefed inadequately for review or to the defendant's citations to the record supporting its position, suggesting that the plaintiffs have abandoned the claims. Accordingly, we decline to review these claims. See *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 44 n.20, 861 A.2d 473 (2004) (declining to review claim "with minimal citation to authority and no citation to the record, and [that] is therefore procedurally not in compliance with Practice Book § 67-4"); *Greenwich Hospital* v. *Gavin*, 265 Conn. 511, 517–18 n.8, 829 A.2d 810 (2003).

[6] The statement of issues in the plaintiffs' brief sets forth four arguments related to the franchise act, one pertaining to the trial court's decision to decide the claim itself and three pertaining to the trial court's analysis of that act. There is substantial overlap, however, between the three arguments regarding the trial court's analysis of the franchise act, and, accordingly, we address these claims under the broader issue of whether the trial court properly determined that there was no franchise relationship.

A

We begin with the plaintiffs' contention that the trial court improperly determined that the court, rather than the jury, should decide their claim alleging a violation of the franchise act. The plaintiffs do not contend either that they had a constitutional right to a jury trial on that issue, or that the franchise act provides for such a right. Rather, they contend that, after having claimed the case for the jury list, the defendant was not entitled to a court trial on the franchise act claim unless it filed a motion to strike the claim from the jury docket. Because the defendant did not do so, but instead raised the issue shortly before the trial commenced, the plaintiffs contend that the trial court improperly determined that the claim would be decided by the court.[7] We disagree.

Practice Book § 16-10 provides: "No issues of fact in an equitable action shall be tried to the jury except upon order of the judicial authority. Upon the application of any party, the judicial authority *may* order any issue or issues of fact in any action demanding equitable relief to be tried by a jury, and such application shall be deemed to be a request for a jury of six." (Emphasis added.) See also General Statutes § 52-218 ("[u]pon the application of either party, the court may order any issue or issues of fact in any action demanding equitable relief to be tried by a jury of six"). Thus, because the trial court has discretion to submit such claims to the jury, we necessarily review its decision to decline to

---

[7] We note that the defendant represented to this court that it had made the request to the trial court to decide the franchise act claim pursuant to a motion in limine, an assertion that the plaintiffs have not contested. Although the record reflects that the defendant filed such a motion with respect to the trade secrets claim, it reflects no such motion with respect to the franchise act claim. Because the defendant does not contend that this motion served as a substitute for a motion to strike and because we do not have this motion before us to assess the merits of such an argument, we reach the merits of the plaintiffs' claim.

do so under an abuse of discretion standard. See *Varley* v. *Varley*, 189 Conn. 490, 497, 457 A.2d 1065 (1983); *Gagne* v. *Vaccaro*, 80 Conn. App. 436, 443–44, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004).

The plaintiffs have failed to demonstrate that the trial court abused its discretion in this regard. They have provided no support for the proposition that the defendant's failure to file a motion to strike the claim from the jury docket renders the court's decision not to submit the claim to the jury an abuse of discretion as a matter of law. The rules of practice vest discretion in the trial court to decline to submit an equitable claim to the jury after a party files an application making such a request and does not predicate the exercise of that discretion on an objection from the opposing party. See Practice Book § 16-10. Thus, if the trial court has discretion to deny the application even in the absence of an objection, the form of the objection cannot be dispositive as a matter of law. The plaintiffs' reliance on *Meyers* v. *Cornwall Quality Tools, Inc.*, 41 Conn. App. 19, 674 A.2d 444 (1996), for such a proposition is misplaced. That decision simply states the unextraordinary proposition that, in the absence of an objecting party having filed a motion to strike prior to the commencement of trial, the trial court "may" submit the equitable claim to the jury. See id., 26–27 n.13.

Moreover, as we have noted previously, it appears that the trial court articulated the basis for its decision off the record, in a chambers conference. See footnote 3 of this opinion. Thus, we have no way of ascertaining what factors influenced the court in its exercise of its discretion. Although it was the plaintiffs' burden to perfect the record of an issue they intended to raise on appeal; see *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003); they failed to ask the trial court to articulate the basis for its decision

on the record. See Practice Book § 61-10; see also *Preston* v. *State Division of Criminal Justice*, 60 Conn. App. 853, 864–65, 761 A.2d 778 (2000), cert. denied, 255 Conn. 936, 767 A.2d 1212 (2001). Accordingly, the plaintiffs have failed to demonstrate that the trial court abused its discretion by deciding the franchise act claim.

## B

We, therefore, turn to the plaintiffs' challenges to the trial court's conclusion that the defendant was entitled to judgment on the franchise act claim on the grounds that: (1) there was not a franchise relationship; and (2) even if such a relationship existed, the defendant had good cause for terminating the agreements. We conclude that the trial court properly determined that there was not a franchise relationship, and, therefore, we do not consider the alternate ground for the court's decision.

The franchise act provides that a franchise shall not be terminated except upon good cause and sixty days notice. See General Statutes § 42-133f (a). A franchise is defined under the act as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer . . . ." General Statutes § 42-133e

(b). The trial court's oral decision specifically addressed only subdivision (1) of subsection (b), and, therefore, we do not consider whether the fact that most of the plaintiffs' business was derived from the sale of CUNO products would require a decision in the plaintiffs' favor with respect to subdivision (2).

With respect to § 42-133e (b) (1), the trial court concluded that the plaintiffs had not satisfied their burden because they had not demonstrated sufficient control by the defendant such that the court could find that there was a marketing plan prescribed in substantial part by the defendant.[8] Although the court's ultimate conclusion that there was not a marketing plan prescribed in substantial part by the defendant was a legal determination, the court's determination as to insufficient control was a question of fact. See *Getty Petroleum Marketing, Inc.* v. *Ahmad*, 253 Conn. 806, 811, 757 A.2d 494 (2000); *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 346, 356, 736 A.2d 824 (1999); see also *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 696–97, 651 A.2d 1286 (1995) (noting that fundamental distinction between employee and independent contractor is right to control means and methods of work, which presents question of fact). Accordingly, we review that determination under our clearly erroneous standard.[9] "A court's determination

---

[8] We have indicated that, "[t]he definition [of § 42-133e (b) (1)] requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." (Internal quotation marks omitted.) *Getty Petroleum Marketing, Inc.* v. *Ahmad*, supra, 253 Conn. 813. The defendant concedes that the plaintiffs are in the business of selling the defendant's product, and, therefore, we limit our analysis to the second step of this inquiry.

[9] Although the plaintiffs subscribe error to the trial court's failure to articulate the specific factual underpinnings of its conclusion as to insufficient control, we again underscore that it was the plaintiffs' burden, as the party challenging the court's ultimate determination, to seek that articulation. See Practice Book § 61-10. Indeed, because, as we previously have noted, the trial court discussed the factors relevant to control at length in

is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Weinstein* v. *Weinstein*, 275 Conn. 671, 684, 882 A.2d 53 (2005). Moreover, as the trier of fact on this claim, it was within the trial court's province to weigh the evidence presented and to determine the credibility and effect to be given the evidence. *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

As a general matter, when determining whether there is a franchise relationship, we have explained that, "[t]he relationship of the parties, pursuant to § 42-133e (b) (1) is not governed solely by the parties' main written agreement. 'Rather its legal significance is fixed by reality, not by what [the] defendant[s] or [the] plaintiffs call it, though descriptive language may be relevant.' *Petereit* v. *S.B. Thomas, Inc.*, 853 F. Sup. 55, 60 (D. Conn. 1993), aff'd in part, rev'd in part, 63 F.3d 1169 (2d Cir. 1995), cert. denied, 517 U.S. 1119, 116 S. Ct. 1351, 134 L. Ed. 2d 520 (1996); see also *Chem-Tek, Inc.* v. *General Motors Corp.*, 816 F. Sup. 123, 125 (D. Conn. 1993) (finding agreement between parties based on oral and written representations and a long established course of dealings). Accordingly, the statutory test [is] whether the parties' conduct, in addition to their words, constitutes an agreement or arrangement. Any actions constituting an agreement or arrangement, in turn, must be examined when determining whether a marketing plan or system is substantially prescribed." *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 348–49.

its initial discussion with the parties regarding this claim, we surmise that the trial court readily could have provided such an articulation.

Among the factors that we have identified as relevant to determining whether the alleged franchisee conducted its business under a marketing plan substantially prescribed by the alleged franchisor are whether the franchisor had control over the hours and days of operation, advertising, lighting, employee uniforms, prices, hiring of staff, sales quotas and management training. Id., 350. We also consider whether the alleged franchisor provided the franchisee with financial support and had the right to audit its books or to inspect its premises. Id. This list is not definitive, and we have recognized that some factors may be applicable only to certain types of businesses, such as retailers. Id. Indeed, "there is no one factor, or single combination of factors, required in order to constitute the control required under § 42-133e (b) (1)." Id., 357. When present to a sufficient degree, however, these factors reflect that the franchisor has deprived the franchisee of the right to exercise independent judgment in conducting its business. Id., 351–52; *Petereit* v. *S.B. Thomas, Inc.*, supra, 63 F.3d 1181; *Aurigemma* v. *ARCO Petroleum Products Co.*, 698 F. Sup. 1035, 1040 (D. Conn. 1988).

Thus, for example, in *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 334, this court affirmed the trial court's conclusion that there was a franchise relationship between the plaintiff distributor and the defendant manufacturer when the defendant: required a detailed business plan, subject to its approval and monitoring for compliance; set prices—expressly in some cases, effectively in other cases; exerted pressure on the plaintiff's decisions regarding hiring and firing of staff through specific demands and persistent implied threats of terminating the relationship; demanded extensive training of the plaintiff's personnel regarding the defendant's product; exerted significant control over inventory levels either by requiring the plaintiff to maintain certain levels or by pressuring the

plaintiff to do so through inspections or reporting of inventory levels; and had the right to inspect the plaintiff's financial records and to require audits.[10] Id., 351–56.

Turning to the present case, we note at the outset that the agreements identify the plaintiffs as independent contractors. We also note that the record is devoid of evidence that the defendant exercised control over hours and days of operation, lighting, and employee uniforms, or that it provided financial support or had the right to audit the plaintiffs' books or inspect their premises.[11] Indeed, the plaintiffs neither claim that there is such evidence nor that these factors are inapplicable to their business. Thus, these factors support the trial court's determination.

Rather, the plaintiffs contend that the defendant exerted sufficient control over their business by setting prices, exerting pressure regarding the hiring and retention of staff, controlling inventory, prescribing and monitoring sales through an annual sales planning process,

---

[10] The plaintiffs assert a broad claim, unsupported by citations to the record, that the trial court improperly applied a "restrictive" reading of *Hartford Electric Supply Co.*, in contravention to the remedial purpose of the franchise act. We disagree. We have recognized that "[t]he franchise act's remedial purpose, to prevent a franchisor from unfairly exerting economic leverage over a franchisee, indicates that the statute should be read broadly in favor of the plaintiff." *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 345; accord *Muha* v. *United Oil Co.*, 180 Conn. 720, 728, 433 A.2d 1009 (1980) (franchise act is "remedial in nature and should be liberally construed in favor of the class sought to be benefited"). The franchise act provides a remedy, however, for those who can satisfy the elements of establishing a franchise relationship. See *Getty Petroleum Marketing, Inc.* v. *Ahmad*, supra, 253 Conn. 819 (recognizing remedial purpose of act but reversing trial court's judgment concluding that franchise existed, noting that trial court's conclusion "would blur the distinction between the entrepreneur and one who acts as an agent for another in selling a product"). The plaintiffs' proof in this regard fell well short of establishing that the factors relevant to control weighed in their favor.

[11] In fact, Edmands testified that he had determined the hours of operation and employee dress code for Eastern.

and setting marketing requirements. Therefore, we turn to the record to determine whether there is evidence that would compel the conclusion that the defendant exercised sufficient control over these aspects of the plaintiffs' business.

1

We begin with the issue of pricing, a factor that we have identified as "one of the most significant criteria for determining control." Id., 351. As we have noted previously, there are two different types of agreements implicated in the present case: sales representative agreements and distributorship agreements. Under the express terms of the sales representative agreements, the defendant has complete control over pricing in that the plaintiffs must: make price quotations to customers in accordance with the defendant's published price and discount sheets; promptly mail a copy to the defendant of every written quotation the plaintiffs make to a customer; and receive written authorization from the defendant when deviating from the price sheets. Because the plaintiffs' complaint alleges that the agreements *collectively* establish a franchise, however, we must consider whether the plaintiffs have established that the defendant controls pricing in the *overall* operation of their business pursuant to the agreements collectively.[12] Cf. *Aurigemma* v. *ARCO Petroleum Products Co.*, supra, 698 F. Sup. 1038–41 (alleging two sepa-

---

[12] The plaintiffs have made no mention in their briefs as to the price controls expressly set forth in the sales representative agreements. Indeed, neither the plaintiffs nor the defendant have made clear with respect to *any* of the pertinent factors whether the evidence applies specifically to one of the agreements or both. Where it appears evident, however, from the language of the agreements, we have noted the applicable agreement. We also note that, because the plaintiffs have proceeded under a theory that the collective agreements establish a franchise, to the extent that there is no evidence as to the defendant's control under one of the agreements with respect to a factor, that deficiency necessarily weighs in favor of the trial court's finding of insufficient control.

rate violations of franchise act based on termination of lessee dealer gasoline agreement governing operation of gasoline station and based on termination of mini market agreement governing operation of convenience store).

Unlike the sales representative agreements, the evidence with respect to the distributorship agreements indicates that the defendant does not control pricing under those agreements. First, there are no express terms under the distributorship agreements prescribing the prices that the plaintiffs must charge customers when they sell CUNO products from the inventory that they have purchased from the defendant. Second, the undisputed testimony at trial indicated that, although the defendant provided the plaintiffs with a list setting forth a manufacturer's suggested retail price for each product, the defendant did not require that the plaintiffs sell the product at that price, and indeed, did not know at what price the plaintiffs ultimately sold the products. The plaintiffs determined the price that they would charge the customer and, in most instances, they sold the product at a price that exceeded the defendant's suggested retail price. These facts clearly do not indicate that the defendant controlled pricing under the distributorship agreement. Cf. *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 352 (control exhibited when defendant dictated prices for national customers, published catalogue with manufacturer's suggested retail price and instructed plaintiff on price quotes for training customers on defendant's products). Thus, on the one hand, the defendant controlled pricing when the plaintiffs were acting as a sales representative, but, on the other hand, the plaintiffs substantially controlled pricing when acting as a distributor. It is reasonable to conclude, however, absent evidence to the contrary, that sufficient control as to pricing rested with the plaintiffs when viewing the agreements collectively

because they could dictate the percentage of their business conducted as a distributor by assuming the risk of ordering more CUNO products to sell out of their inventory.[13]

Nonetheless, the plaintiffs claim that the defendant effectively controlled the retail price by virtue of its control over the cost it charged the plaintiffs for products ordered. According to the plaintiffs, the defendant exercised this control by charging them a price that was discounted from the suggested retail price based on the volume of the order, and its knowledge of the plaintiffs' commission rate on outside sales. Specifically, they contend that the defendant could "maneuver [the plaintiffs] into the commercially impractical position of either sacrificing the sale [from a customer seeking price concessions] or sacrificing a substantial portion of its profit margin to make the sale . . . ." Under that logic, however, a franchise would be created whenever a manufacturer refused to barter over wholesale prices. It is clear that such conduct does not constitute the type of control to which the franchise act is directed.

2

Turning to the issue of whether the defendant exercised control over the plaintiffs' hiring of staff, we also conclude that the evidence supports the trial court's conclusion. The parties' agreements contain no requirements as to the plaintiffs' staff. Doina, the defendant's vice president, testified that the defendant and the plaintiffs would discuss the level of staff needed to service adequately the plaintiffs' territory and that they generally would come to an agreement as to the appropriate

---

[13] Although the plaintiffs have indicated what percentage of their total business was based on sales of CUNO products, they have pointed us to no evidence reflecting the percentage of their business conducted as a distributor as compared to as a sales representative.

level. Exhibits produced at trial reflect that, in letters and faxes spanning almost a four year period, the defendant repeatedly inquired and expressed concern about the plaintiffs' efforts to replace salespersons who had terminated their employment with the plaintiffs. In most instances, however, the inquiry consisted of a single sentence, simply asking to be updated on the status of hiring the replacements. Although one communication in that four year period contained what could be construed as a veiled threat of termination if the plaintiffs' hiring efforts were unsuccessful,[14] the fact that the defendant took no adverse action in response to that situation until it terminated the relationship several years later—despite the plaintiffs' apparent continued inability or unwillingness to respond satisfactorily to the defendant's concern—indicates that the defendant did not exercise any meaningful control over the plaintiffs' hiring practices. Indeed, although the defendant made repeated requests that the plaintiffs hire a salesperson with a particular technical background to service pharmaceutical customers, Edmands admitted that he declined to do so because he did not believe that there was sufficient pharmaceutical production in his territory to justify the cost. Finally, there is no evidence that the defendant ever pressured the plaintiff to terminate staff. Thus, these facts do not indicate that the defendant exercised the requisite control over the plaintiffs' staffing decisions. Cf. *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 353 (finding sufficient control by defendant, even though plaintiff

---

[14] A December 17, 1996 letter, sent by Doina to Edmands, provided: "It has been approximately [seven] months since Craig Self resigned from his position as an outside salesman with [Eastern]. Although I understand [Eastern] has had difficulty finding a replacement, we consider the current staffing inadequate and unacceptable. If a salesman is not hired by the end of January, we will assume [Eastern] will not replace [Self] and adjust our plan accordingly." Testimony indicated that the plaintiffs did not hire a salesperson to replace Self until June, 1997.

retained ultimate control over hiring and firing, when: agreement required that plaintiff maintain staff trained to sell defendant's product; defendant exerted pressure on plaintiff to hire both specialists for its products and sales and operations managers; and defendant placed plaintiff in remedial program for underperforming distributors that "perpetually carries an implied threat of termination" while exerting pressure regarding staffing decisions).

3

Similarly, there was not sufficient evidence that the defendant had exercised control over the plaintiffs' inventory. Although the distributorship agreements dictate the terms and conditions for the return of CUNO products purchased by the plaintiffs, those agreements do not require the plaintiffs to maintain particular stock levels or to carry specific products. Consistent with those agreements, Edmands testified that, with the exception of new product launches, the plaintiffs could order any quantity of merchandise they chose. He further testified that the defendant "suggested" inventory levels and took no adverse actions if the plaintiffs did not meet those levels. Moreover, Edmands admitted that, although, at the plaintiffs' annual sales action meeting, the defendant and each distributor typically would agree to an inventory level for a new product, the plaintiffs did not always purchase the level of introductory products that the defendant wanted them to carry. Cf. *Petereit* v. *S.B. Thomas, Inc.*, supra, 63 F.3d 1181 (franchise existed when, inter alia, defendant determined product mix, increased distributors' orders on occasion to stimulate sales, controlled product placement on fresh food counters, and set standards and procedures with respect to out-of-date product).

4

Finally, we turn to the plaintiffs' claim that the defendant exercised control pursuant to a marketing plan it

substantially prescribed by virtue of the annual "sales action plan." Testimony from Doina and Edmands was consistent in describing the sales action planning process as follows. The defendant and the plaintiffs met annually to create a plan for customer accounts to be developed. The defendant commenced the process by creating a list of customers for the plaintiffs to target based on information the defendant had culled from directories listing, for example, all chemical plants in the United States and the products those plants produced. The defendant then forwarded the list to the plaintiffs, who could either add accounts or delete listed accounts that the plaintiffs did not think had good potential. After refining the list, the plaintiffs worked with their salespeople to forecast sales by account and then to prescribe the activities both the plaintiffs and defendant needed to undertake to meet that goal. Each year, the defendant and the plaintiffs repeated this process, setting targets for new customers and revising projections for existing customers based on the plaintiffs' progress in meeting the prior year's goals. Doina described the annual process as "cooperative." This description was consistent with Edmands' testimony that he and the defendant "kind of kicked around" numbers to develop the sales projections, although Edmands also testified that the defendant had the final word on the sales targets. In between these annual meetings, the defendant monitored sales monthly and sent the plaintiffs reports that compared actual sales to the projections. When the plaintiffs' sales fell short of those projections, however, the defendant's typical response was to send a "quick note" stating the amount of the shortfall and asking how the plaintiffs intended to react. In 1997, when the plaintiffs' sales fell 35 percent below projections, the defendant took no adverse action against the plaintiffs nor apparently threatened any such action.

In our view, although the defendant exercised some control through the annual sales planning process, these facts do not demonstrate the requisite degree of control. It is not enough that the plaintiffs reasonably may have felt under enormous pressure to meet the sales targets because the lion's share of their business depended on maintaining the relationship with the defendant. The defendant did not dictate the means by which the plaintiffs were to achieve the sales objectives. Cf. *Aurigemma* v. *ARCO Petroleum Products Co.*, supra, 698 F. Sup. 1041 (franchise for convenience store existed when agreement incorporated manual that prescribed standards of operation with regard to, inter alia, accounting standards, auditing procedures and inventory criteria). Neither did the defendant force the plaintiffs to take specific corrective measures nor did it impose punitive measures. In fact, the defendant did not take *any* adverse action against the plaintiffs for failing to achieve plan objectives until many years after expressing concerns regarding sales. Compare *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 351 (franchise existed when defendant had final approval of business plan proposed by plaintiff and thereafter defendant enforced that plan by placing plaintiff in probationary program for failure to meet plan goals) with *Aurigemma* v. *ARCO Petroleum Products Co.*, supra, 1039 (defendant's national marketing plan for gasoline station did not evidence franchise when plaintiffs did not show that they were bound or subject to control pursuant to that plan). The plan in the present case did nothing more than set sales goals. It did not prescribe the plaintiffs' operation of their business with respect to the factors that we have identified as hallmarks of control.

In sum, the evidence reflects that the plaintiffs were able to exercise independent judgment on most aspects of their business. The defendant's ability to exert mean-

ingful control over the plaintiffs' operation of their business is belied by both its inability to compel the plaintiffs to achieve its objectives over a sustained period of time and its inaction when the plaintiffs failed to satisfy those objectives.[15] Accordingly, we conclude that the trial court's finding that the plaintiffs had failed to prove that the defendant exercised sufficient control over their business to evidence a marketing plan prescribed in substantial part by the defendant was not clearly erroneous.

C

We next address the plaintiffs' contention that the trial court improperly refused to submit to the jury their CUTPA claim and implied covenant of good faith and fair dealing claim. The plaintiffs contend that the trial court's decision was improper based on: (1) its initial improper conclusion that they could not prevail on their franchise act claim; and (2) its subsequent improper conclusion that the CUTPA and fair dealing claims rested solely on the violation of the franchise act. Our conclusions in parts I A and B of this opinion dispose of the first contention. With respect to the second contention, we conclude that the trial court properly rendered judgment for the defendant.

The legal sufficiency of the allegations of the CUTPA and fair dealing claims as independent from the alleged violation of the franchise act is a question of law over which we exercise plenary review. *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 367; see also *Barretta* v. *Otis Elevator Co.*, 242 Conn. 169, 171, 698 A.2d 810 (1997) (court exercises plenary review

---

[15] The plaintiffs' claim that the defendant exercised control over marketing is without merit. The plaintiffs point only to the marketing provision in the agreements, and those provisions simply impose a bilateral obligation to exchange information in order to assist the other party in marketing the product.

over issue of whether allegations were sufficient to require instruction on doctrine of res ipsa loquitur). Turning to those allegations, we note that the first count of the complaint, asserting a claim under the franchise act, alleged the following facts: (1) the existence of the 1984 agreements; (2) the defendant's unilateral termination of the agreements; (3) the absence of good cause for the termination; and (4) the defendant's failure to furnish proper notice and its termination of the agreements in the absence of actual breach by the plaintiffs. The complaint incorporated by reference the allegations from the first count into the second and third counts of the complaint, which respectively asserted the CUTPA violation and the breach of the covenant of good faith and fair dealing. These allegations are the *only* factual allegations set forth in the complaint in support of the second and third counts.

Turning to the legal requirements of a CUTPA claim, the plaintiffs must establish that the defendant engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). It is not necessary that the conduct at issue violate some other law to constitute a CUTPA violation, but the plaintiffs must prove wrongful conduct.[16] See *Willow*

---

[16] "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 155, 881 A.2d 937 (2005); but see *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 82 n.34, 873 A.2d 929 (2005) (noting "that a serious question exists as to whether the cigarette rule remains the guiding rule utilized under federal law").

*Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 43, 717 A.2d 77 (1998) ("CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law"); see also *Grand Light & Supply Co.* v. *Honeywell, Inc.*, 771 F.2d 672, 679–81 (2d Cir. 1985) (remanding case for trial on issue of CUTPA violation after reversing trial court's judgment in favor of plaintiff on franchise act claim). In the present case, however, because there is no franchise relationship, it is undisputed that the defendant had the express right under the agreements, as did the plaintiffs, to terminate the relationship unilaterally upon thirty days notice without cause. Because it is undisputed that the termination conformed in all respects to the express terms of the parties' agreements, we, therefore, have great difficulty identifying the wrong the plaintiffs seek to assert. See *McKeown Distributors, Inc.* v. *Gyp-Crete Corp.*, 618 F. Sup. 632, 644 (D. Conn. 1985) (concluding in light of conclusion that defendant had terminated agreement in accordance with its terms, "there can be nothing unfair or deceptive either in [the defendant's] termination of the [a]greement, or in its offer, made only after the termination, to supply the product directly to [the plaintiff's] former customers"). Without more, the plaintiffs have not alleged a CUTPA violation.

In the absence of any allegations of wrongdoing, for similar reasons, the trial court also properly determined that its decision to render judgment for the defendant on the franchise act claim required it to render judgment for the defendant with respect to the claimed breach of the covenant of good faith and fair dealing. Indeed, neither the plaintiffs' response to the trial court's decision in favor of the defendant on the CUTPA and fair dealing claims nor their brief to this court challenging that decision suggests any basis on which to read the allegations of the complaint more expansively than their

plain language suggests. Accordingly, we conclude that the trial court properly rendered judgment for the defendant on the plaintiffs' claims.

## II

We now turn to the plaintiffs' challenges relating to the trial court's judgment in favor of the defendant on its counterclaim for breach of contract. As we have noted previously, that counterclaim was predicated on the plaintiffs' failure to return or pay for certain CUNO products in their inventory. The plaintiffs contend that the trial court improperly: (1) denied the plaintiffs' motion to set aside the verdict with respect to the judgment against Edmands personally; and (2) ordered the plaintiffs to disclose additional assets to secure the judgment on this counterclaim. We reject both of these contentions.

## A

We begin with the plaintiffs' claim that the trial court should have set aside the verdict against Edmands personally. Specifically, they contend that Edmands cannot be held liable for inventory purchased by Eastern because it is a corporation and the defendant adduced no evidence to pierce the corporate veil or to demonstrate a separate, personal obligation on Edmands' part. The defendant responds that the plaintiffs: (1) judicially have admitted Edmands' personal liability through the pleadings; (2) have waived this claim by failing to assert it until after the jury returned the verdict; and (3) are estopped from asserting this claim. We agree with the defendant that the trial court properly refused to set aside the verdict against Edmands in light of the pleadings.

The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. "The trial court possesses inherent

power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Citations omitted; internal quotation marks omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 126–27, 851 A.2d 1142 (2004).

The record reveals the following additional undisputed facts. The plaintiffs' complaint was brought on behalf of "Edmands [doing business as] Eastern Filter Sales and [Eastern], a Connecticut Corporation (collectively the 'Franchisee' and at times 'Eastern Filter Sales' as the case may be)." The defendant's amended answer asserted: "By way of Counterclaim, [the] [d]efendant . . . sues [Edmands doing business as] Eastern Filter Sales and [Eastern] (*collectively 'EFS'*) . . . ." (Emphasis added.) In its counterclaim alleging breach of contract, the defendant alleged that: (1) "Edmands [doing business as] Eastern Filter Sales is the owner of Eastern Filter Sales"; (2) in 1984, "[the defendant] and EFS entered into four agreements"; (3) "[a]s a CUNO [products] distributor, EFS was required to pay for all of the CUNO product[s] it ordered"; (4) "[s]ince the termination, [the defendant] has made repeated requests to EFS that it either pay for or return the CUNO product[s] in its possession, but EFS has never responded to those requests"; and (5) "EFS still possesses over $80,000 worth of CUNO product[s] and, as such, is in breach of . . . the [d]istributorship [a]greements." In the plaintiffs' answer to the counterclaim, they admitted

the first three allegations and asserted a general denial as to the latter two allegations. They further asserted in their special defenses that "[t]he [p]laintiffs have fully or partially paid for any and all product[s] in their possession," and that "the [p]laintiffs have been damaged and are not liable to the [d]efendant for such inventory."

These pleadings reflect that Edmands brought suit in his own name and in the corporation's name and, similarly, that the defendant asserted its counterclaim against both Edmands and the corporation. The pleadings further reflect that, by virtue of the plaintiffs having admitted in their answer to the counterclaim that, "EFS [which was defined in the defendant's counterclaim as referring collectively to Edmands and the corporation] was required to pay for all of the CUNO product[s] it ordered," the plaintiffs judicially admitted Edmands' personal liability for unpaid goods.[17] It is well settled that, "[f]actual allegations contained in pleadings upon which the case is tried are considered judicial admissions and hence irrefutable as long as they remain in the case. . . . An admission in pleading dispenses with proof, and is equivalent to proof." (Citations omitted; internal quotation marks omitted.) *Ferreira* v. *Pringle*,

---

[17] The plaintiffs have neither asserted nor provided us with any authority that the designation of Edmands as an individual "doing business as" Eastern precludes Edmands' personal liability. Our research suggests a contrary rule. See *Bauer* v. *Pounds*, 61 Conn. App. 29, 36, 762 A.2d 499 (2000) ("[i]t appears well settled that the use of a fictitious or assumed business name does not create a separate legal entity . . . [and that] [t]he designation [doing business as] . . . is merely descriptive of the person or corporation who does business under some other name" [internal quotation marks omitted]) and cases cited therein; see also *Southern Ins. Co.* v. *Consumer Ins. Agency, Inc.*, 442 F. Sup. 30, 31–32 (1977) (noting that, consistent with common meaning of term and case law of other jurisdictions, under Texas law, "when the phrase 'doing business as' follows a person's name, it signifies that the individual is the owner and operator of the business whose trade name follows his, and makes him personally liable for the torts and contracts of the business").

255 Conn. 330, 345, 766 A.2d 400 (2001); see *MacDonald* v. *Pinto*, 62 Conn. App. 317, 321, 771 A.2d 156 (2001) (plaintiff did not have to prove existence of oral contract because defendant admitted to its existence in his answer and at trial).

The plaintiffs never moved to amend their complaint to delete Edmands as a party, nor did they seek to amend their answer to the defendant's counterclaim to contest Edmands' personal liability. Cf. *Rahmati* v. *Mehri*, 188 Conn. 583, 587, 452 A.2d 638 (1982) (after defendant conceded in his answer to plaintiff's complaint and in his own suit that he had acted in his own name, defendant sought permission to amend pleadings to substitute his professional corporation as defendant on ground that he could not have been held personally liable). Indeed, consistent with the pleadings and without objection from the plaintiffs, the trial court submitted a verdict form to the jury on the defendant's counterclaim that provided: (1) "Did the *plaintiffs* breach their [contract] with [the defendant] by ordering and accepting products for which they have not paid?"; and (2) "What damages did [the defendant] prove as a result of the *plaintiffs'* breach of contract?" (Emphasis added.) Accordingly, the trial court did not abuse its discretion by denying the plaintiffs' motion to set aside the verdict against Edmands.

B

Finally, we turn to the plaintiffs' claim that the trial court improperly ordered the plaintiffs to disclose assets in order to secure the judgment, pursuant to General Statutes § 52-278n (a), based on the court's determination as to the value of certain CUNO products in the plaintiffs' inventory. The plaintiffs contend that the trial court improperly undervalued this inventory because it failed to adopt the retail value attested to by Edmands and instead relied on the defendant's valua-

tion, which was based on its return policy that does not calculate value on a retail basis. In response, the defendant contends that the trial court properly rejected the plaintiffs' proffered retail value as speculative, crediting instead the defendant's witness who testified that much of the inventory would sell below retail value because it was not in saleable condition or was obsolete.[18] We agree with the defendant.

The record reveals the following additional facts relevant to this claim. After the trial court accepted the jury's verdict awarding the defendant $88,716.12 in damages and $26,259.97 in interest, the defendant filed an application for prejudgment remedy and a motion for disclosure of the plaintiffs' assets. Thereafter, the trial court granted the defendant's application for prejudgment remedy, and, on October 18, 2004, the court held a hearing to ascertain the value of the assets disclosed by the plaintiffs to secure the judgment. In their memorandum to the trial court, the plaintiffs disclosed assets that included CUNO products in their inventory they valued at $179,642.84 retail, based on the defendant's 1999 suggested retail price list, and $91,140.16 wholesale. The defendant contested that valuation and asserted that the actual retail value was $15,361.04.

In its memorandum of decision, the trial court concluded that the retail value of the inventory was the appropriate measure of valuation. It further concluded, however, that, in light of Edmands' testimony that he could not sell the goods and that the defendant would have to sell them, the market presented was that available to the defendant. The court, therefore, determined

---

[18] The defendant also contends that the plaintiffs have briefed this claim inadequately for our review. Although the plaintiffs once again have failed to include any citations to the record for the testimony on which they rely, their claim essentially is founded on the trial court's application of the law to the facts, as set forth in the court's memorandum of decision. Accordingly, we conclude that there is an adequate basis to review the plaintiffs' claim.

that testimony proffered by Frank Zagarino, the defendant's customer service manager, "on the condition of the product, obsolescence . . . [and] cost of repackaging [is] relevant on the ultimate question of what the practical retail value of the product in fact is." The plaintiffs had failed to account for these relevant factors and, accordingly, the trial court adopted the defendant's valuation of $15,361.04.

We review the plaintiffs' challenge to the trial court's valuation of assets to secure a prejudgment remedy under the clearly erroneous standard. Cf. *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 157, 595 A.2d 872 (1991) (reviewing trial court's decision to deny or to grant prejudgment remedy for clear error); cf. also *West Haven* v. *Norback*, 263 Conn. 155, 168, 819 A.2d 235 (2003) (applying clearly erroneous standard to trial court's fair market valuation of property in eminent domain cases). We do so mindful, however, that "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Burton* v. *Mottolese*, supra, 267 Conn. 40.

Zagarino offered an opinion that the retail value of the inventory was $15,361.04, a figure he derived on the basis of a physical inspection of the goods listed on the plaintiffs' inventory sheet and that, consistent with the defendant's method for calculating credit for goods returned from its distributors, took into account the age, condition, marketability and repackaging costs of the goods. By contrast, Edmands projected a retail value for the inventory based on the defendant's 1999 suggested retail price list, which did not take into account the factors relied on by Zagarino. Edmands also admitted that the plaintiffs would be unable to sell the goods themselves and that he could not verify the total accuracy of the inventory list.

We conclude that the trial court reasonably determined that the plaintiffs' valuation was not realistic based on the actual market for the goods and that it would be improper to adopt a compromise figure unconnected to an exact calculation of the practical retail value. Cf. *Fuessenich* v. *DiNardo*, 195 Conn. 144, 153, 487 A.2d 514 (1985) ("[i]n an action at law based upon contract the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount" [internal quotation marks omitted]). Therefore, it was not clearly erroneous for the trial court to accept the defendant's method of valuing the inventory over the method applied by the plaintiffs and to adopt the value proffered by the defendant. See *DaimlerChrysler Corp.* v. *Allard*, 272 Conn. 1, 7–8, 860 A.2d 1223 (2004) ("[i]n assessing the value of property . . . the trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation" [internal quotation marks omitted]). Accordingly, the trial court properly granted the defendant's motion for disclosure of assets.

The judgment is affirmed.

In this opinion the other justices concurred.