GETTY PETROLEUM MARKETING, INC.
*v.* WAGAR AHMAD
(SC 16168)

GETTY PETROLEUM MARKETING, INC.
*v.* E. Z. SAVE, INC., ET AL.
(SC 16169)

McDonald, C. J., and Norcott, Palmer, Sullivan and Vertefeuille, Js.

Argued February 18—officially released July 25, 2000

*Charles T. Lee*, with whom, on the brief, were *Harold N. Eddy, Jr.*, and *Matthew S. Antonetti*, for the appellant (plaintiff).

*Donald P. Reney, Jr.*, for the appellees (defendants).

*Opinion*

MCDONALD, C. J. In the present cases, the plaintiff, Getty Petroleum Marketing, Inc., appeals from the judgments of the trial court dismissing its summary process actions against the defendants, Wagar Ahmad, E.Z. Save, Inc., and Shop-Ways, Inc., after that court found that the plaintiff had failed to provide notice to the defendants as required by General Statutes § 42-133f (a)[1] of the Connecticut franchise act (general franchise

---

[1] General Statutes § 42-133f (a) provides: "No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement or for the reasons stated in subsection (e) of this section. The franchisor shall give the franchisee written notice of such termination, cancellation or intent not to renew, at least sixty days in advance to such termination, cancellation or failure

act), General Statutes §§ 42-133e through 42-133h, for termination of the leases between the parties. We conclude that such notice was not required because the parties' agreements do not create franchises within the meaning of the general franchise act.

The following facts and procedural history are relevant to these appeals. On March 16, 1993, the plaintiff's predecessor in interest, Getty Petroleum Corporation, and Ahmad entered into written agreements entitled Retail Gasoline Lease Agreement and Lessee Supply Contract (agreements) for a retail gasoline station located at 154 South Main Street in Torrington (Torrington station). The agreements were for a period of three years.

Ahmad subsequently assigned the agreements to E.Z. Save, Inc., and Shop-Ways, Inc., but he remained liable for payment and performance of all the terms and conditions of the agreements.[2] The period of these agreements subsequently was extended to March 31, 1999.

On July 3, 1993, the plaintiff and Ahmad entered into a set of second written agreements that also were entitled Retail Gasoline Lease Agreement and Lessee Supply

to renew with the cause stated thereon; provided, in the event the franchisor elects not to renew a franchise pursuant to subsection (e) of this section, the franchisor shall give the franchisee written notice of such intent not to renew at least six months prior to the expiration of the current franchise agreement. The provisions of this section shall not apply (1) where the alleged grounds are voluntary abandonment by the franchisee of the franchise relationship, in which event, such notice may be given thirty days in advance of such termination, cancellation or failure to renew, or (2) where the alleged grounds are the conviction of the franchisee in a court of competent jurisdiction of an offense punishable by a term of imprisonment in excess of one year and directly related to the business conducted pursuant to the franchise, in which event, such notice may be given at any time following such conviction and shall be effective upon delivery and written receipt of such notice."

[2] When appropriate, Ahmad, E.Z. Save, Inc., and Shop-Ways, Inc., collectively will be referred to as the defendants.

Contract ( second agreements) for a retail gasoline station located at 44 South Street in Bristol (Bristol station). The second agreements concerning the Bristol station are identical in their substance to the agreements concerning the Torrington station.[3] The term of the second agreements also was for a period of three years. These second agreements subsequently were extended to July 31, 1999.

On April 7, 1998, the plaintiff informed the defendants that the agreements concerning the Torrington station were terminated effective May 10, 1998. The plaintiff claimed that the defendants had defaulted on the agreements by failing to maintain proper inventory records and to perform required gauge and water checks at the Torrington station's fuel tanks, and by consistently and repeatedly failing to deliver to the plaintiff in a timely manner the funds received for sales of the plaintiff's gasoline at that station. The defendants did not vacate the premises. The plaintiff then caused notices to quit to be served on the defendants and later filed a summary process complaint.

On May 19, 1998, the plaintiff informed Ahmad that the second agreements concerning the Bristol station were terminated effective May 29, 1998. The plaintiff claimed that Ahmad had refused to pump the plaintiff's gasoline at the Bristol station. Later, the plaintiff served a notice to quit on Ahmad and, still later, a summary process complaint seeking possession of the Bristol station.

After conducting separate trials, the trial court dismissed both summary process complaints for lack of jurisdiction. The trial court concluded that the plaintiff had not provided the required notice to the defendants

---

[3] Because the second agreements concerning the Bristol station are substantively identical to the agreements concerning the Torrington station, we will address both sets of agreements collectively.

under the general franchise act for termination of the leases between the parties, and that the failure to provide that notice was a jurisdictional defect. In reaching this conclusion, the trial court reasoned that although the parties' arrangements did not qualify as franchises under the petroleum franchise act; General Statutes §§ 42-133j through 42-133n; the general franchise act was applicable. The trial court concluded that the parties had a franchise relationship under the general franchise act, and that the plaintiff's actions had to be dismissed because the general franchise act requires, inter alia, advance notice of at least sixty days before termination of a franchise. See footnote 1 of this opinion. The plaintiff appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the plaintiff claims that the trial court improperly applied the general franchise act to these actions, because only the petroleum franchise act may be applied to the distribution and sale of motor fuel. The plaintiff argues that, after finding that the parties' agreements did not create franchises under the petroleum franchise act because the plaintiff was not a franchisor under that act,[4] the trial court should not have proceeded to analyze the plaintiff's claims under the general franchise act. The plaintiff also claims that, even if we conclude that the general franchise act does apply, the trial court improperly determined that the agreements constituted franchises within the meaning of that act. We agree with the plaintiff that the parties' agreements do not create franchises within the meaning of the general franchise act and find this conclusion dispositive of the appeal. Accordingly, we reverse the

[4] It is not disputed that the agreements do not establish franchises that are subject to the provisions of the petroleum franchise act.

judgments of the trial court and remand the cases back to that court for further proceedings.[5]

The trial court's findings that the agreements established franchises subject to the provisions of the general franchise act are findings of fact, and we reverse such findings only when they are clearly erroneous. See, e.g., *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 345, 736 A.2d 824 (1999). "A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." Id., 345–46.

Section 42-133e (b) of the general franchise act defines franchise as "an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily for its own independent merchandising activities; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner

---

[5] Because we reverse the judgments on the basis that no franchise existed, we do not address the plaintiff's argument that the trial court should not have applied the general franchise act to the agreements. We assume, arguendo, that the act applies in these circumstances.

or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer . . . ." A franchisee under the act is defined as "a person to whom a franchise is granted, including a distributor, wholesaler or jobber or retailer who is granted the authority under a franchise to use a trademark, tradename, service mark or other identifying symbol or name." General Statutes § 42-133e (d). A franchisor is defined in the act as "a person who grants a franchise to another person, including a manufacturer, refiner or producer or a distributor, wholesaler or jobber who grants to a distributor, wholesaler or jobber or retailer, as the case may be, the authority to use a trademark, tradename, service mark or other identifying symbol or name under a franchise . . . ." General Statutes § 42-133e (c).

The trial court found that franchises existed between the parties that were subject to the general franchise act, which requires that a franchisee "engage in the business of offering, selling or distributing goods or services under a marketing plan or system . . . ." General Statutes § 42-133e (b). As evidence of a marketing plan, the trial court cited the fact that the plaintiff had a large amount of control over the defendants' sale of gasoline,[6] such as setting the price of the gasoline, requiring a minimum gallonage of gasoline to be sold each month, requiring approval for all signs and advertising, and requiring that the defendants operate the stations during certain hours and in accordance with the plaintiff's standards of quality, appearance, cleanliness and service. We do not review the trial court's finding that a marketing plan existed because we conclude that

[6] The defendants also sold Getty motor oil, steering oil and other promotional items. The trial court found that the defendants purchased these items from the plaintiff and that the defendants set their retail price. Because " 'price is perhaps the most fundamental aspect of a marketing plan' "; *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, supra, 250 Conn. 351; we agree with the trial court that the focus of whether there was a marketing plan was properly on the sale of gasoline, not these other items.

there is no evidence to support the trial court's finding that the defendants were engaged in the business of offering, selling or distributing gasoline under such a marketing plan. We conclude that such evidence was required for there to be franchises.

The definition of a franchise under the general franchise act expressly requires that the franchisee be "granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system . . . ." General Statutes § 42-133e (b). The definition "requires a two-step inquiry. First, the franchisee must have the right to offer, sell or distribute goods or services. Second, the franchisor must substantially prescribe a marketing plan for the offering, selling or distributing of goods or services." *Chem-Tek, Inc.* v. *General Motors Corp.*, 816 F. Sup. 123, 127 (D. Conn. 1993).

The following additional facts are necessary to the determination of whether the agreements gave the defendants the right to engage in the business of offering or selling goods under a marketing plan or system.[7] The agreements provided that the plaintiff would deliver gasoline and other petroleum products to the defendants and would set the price for the sale of that gasoline at the gasoline stations leased to the defendants. The agreements further provided that the plaintiff retained ownership of the gasoline after delivery to the defendants "until sold to [the plaintiff's] customers." The plaintiff also owned all of the income and accounts receivable arising out of the sale of the gasoline. The defendants are referred to in the agreements as "commission agents" and were paid a commission of $.065 per gallon "for each gallon of 'Getty' gasoline sold through the [plaintiff's] marketing equipment . . . ."

---

[7] Because the defendants dealt with the public at a retail level, they clearly were not distributing the gasoline.

The defendants were required under the agreements promptly to deposit the proceeds from gasoline sales in the plaintiff's drop safes. The defendants also operated convenience stores at both locations leased from the plaintiff.[8] The operation of the stores was completely independent, however, from the defendants' relationship with the plaintiff.

No Connecticut appellate court has addressed the meaning of the terms "offering" or "selling" under the general franchise act. The United States District Court, however, has analyzed those terms in the context of a case with facts similar to those before us.

In *Automatic Comfort Corp.* v. *D & R Service, Inc.*, 627 F. Sup. 783, 787 (D. Conn. 1986), the court thoroughly analyzed the concept of engaging in the business of offering or selling gasoline under the petroleum franchise act,[9] and held that the contract between the plaintiff and the defendant in that case was not a franchise under that act. The court reasoned that "[w]hile [the] defendant was clearly operating within a marketing plan dictated by [the] plaintiff . . . the parties' contract did not frame a relationship which Connecticut has defined as a franchise"; (citation omitted) id., 786; because the defendant was not a franchisee, or, more specifically, a retailer that was "engaged in the business of offering or selling gasoline." Id. The court stated that "[t]he question [of whether one is engaged in the business of offering or selling gasoline] can best be analyzed by measuring how far [the] defendant is from the situation

---

[8] A convenience store is defined as "a retail store that carries a limited selection of basic items, as packaged foods and drugstore items, and is open long hours for the convenience of shoppers." Random House Dictionary of the English Language (2d Ed. 1987).

[9] At the time that *Automatic Comfort Corp.* v. *D & R Service, Inc.*, supra, 627 F. Sup. 783, was decided, and prior to 1991, the requirements for a franchise under the petroleum franchise act and the general franchise act were the same. The general franchise act remains unchanged to this date.

of a pure employee, who merely takes money and hands it over to his employer. To be a franchise, the franchisee must be engaged in the business of offering or selling gasoline. In actuality it is the plaintiff who is offering/selling gasoline to the public. It owns the station. It buys the gasoline. It arranges for the acquisition of the gasoline and delivers it to the stations. It sets the prices. It is at risk for any loss of the gasoline at the station except by reason of fault on the part of defendant." Id. The court noted that "[the] defendant was not at any substantial market risk, nor did it have any substantial indicia of entrepreneurial responsibility." Id.

We agree with the reasoning of *Automatic Comfort Corp.* that it is the independent function of the parties in a marketing arrangement that controls whether the parties have created a franchise. In this case, the evidence was that the plaintiff owned the gasoline, delivered the gasoline to the stations and set the price of the gasoline. The agreements provided for the sale of the plaintiff's gasoline,[10] through the plaintiff's equip-

---

[10] The agreements between the plaintiff and Ahmad provide in relevant part:

"Retail Gasoline Station Lease Agreement . . .

"Agreement made March 16, 1993 between Getty Petroleum Corp. hereinafter called 'Company,' having its principal office at 125 Jericho Turnpike, Jericho, New York 11753 and Wagar Ahmad, hereinafter called 'Lessee,' residing at 2817 Brighton 7th Street, Brooklyn, NY 11235.

"Station 1. Company hereby leases to Lessee and Lessee hereby agrees to lease from Company the retail gasoline station located at 154 South Main Street, Torrington, CT 06790 (the 'Station'), Account Number 06798.

"Term of Lease 2. The term of this lease shall be for a period of three (3) year(s), beginning on March 29, 1993 and ending on March 31, 1996 unless sooner terminated as provided in this lease.

\* \* \*

"Hours of Operation 7. Lessee shall continuously operate and shall keep the Station open for gasoline sales Monday through Saturday 6:00 a.m. to 10:00 p.m. and on Sunday from 7:00 a.m. to 10:00 p.m.

"Minimum Gallonage 8. Commencing on the fourth month of the term of this agreement, the minimum gallonage for each month shall be equal to eighty percent (80%) of the average of the gallonage sold during each of the first four (4) months of the term of this agreement.

\* \* \*

ment to the plaintiff's customers. All cash receipts were

"Use 12. Lessee shall use and occupy the Station for the sale of gasoline, petroleum products and such other merchandise . . . .

\* \* \*

"Abandonment of Station (a) If the Station is closed or unattended for any period in excess of twenty-four (24 hours); or

"Cease Use (b) If Lessee fails to operate the Station primarily for the sale of gasoline; or

"Commingling & Trademark Infringement (c) If Lessee causes or suffers any grade of Getty brand gasoline to be mixed with another grade of Getty brand gasoline, or mixes any other brand or grade of gasoline with Getty brand gasoline in a storage tank connected to a dispensing pump on the premises, or if Lessee sells or holds out for sale as a Getty brand gasoline, gasoline which is not a Getty brand gasoline . . . .

\* \* \*

"Additional Rent 48. This lease provides that Lessee shall operate a retail gasoline station business and sell gasoline in required minimum quantities. It is the principal business of Company to sell gasoline. This agreement has been entered into by Company based upon Lessee's covenant to sell gasoline, in at least the minimum quantities provided in Paragraph 8 of this lease. . . . In the event that Lessee does not sell the minimum gallonage set forth in Paragraph 8 of this lease during any month of the term of this lease, Lessee shall pay to Company for such month as additional rent, the sum of $.06 per gallon for the difference between the lesser quantity of gallonage sold during any such month and the amount determined to be the minimum gallonage pursuant to Paragraph 8 of this lease for such month. . . ."

"Lessee Supply Contract . . .

"Creation of Franchise 1. Company shall sell and Lessee shall sell as commission agent during the entire term of this contract and any extensions and renewals hereof, the gasoline, motor oil and other products marketed and used by Company, as determined by Company.

\* \* \*

"Price for Products and Commission Taxes 4. The prices for the products sold to the public shall be those posted or listed by Company at the time and place of delivery. All prices are subject to change by Company. Company shall pay Lessee a commission as set forth in Paragraph '51' . . . .

\* \* \*

"Use 13. Lessee shall use the Station solely as a retail gasoline station.

"Trademark 14. Company hereby grants to Lessee a license to use, and Lessee shall use Company's trademarks, trade names, brand names, labels, insignias, symbols or imprints to identify and advertise Company's products and shall not use such trademarks . . . for any other purpose. . . .

\* \* \*

"Advertising 19. Lessee shall obtain Company's approval on signs and advertising, including color schemes.

\* \* \*

to be deposited in the plaintiff's drop safe by the defendants, who were "trustee[s] and custodian[s]" of the plaintiff's funds. There was also evidence that all credit card payments were credited directly to the plaintiff.

"Uniforms 23. Lessee and all its employees shall be dressed in uniforms approved by Company when working at the Station.

"Inspection Quality Control 24  Lessee shall permit Company, by its representatives or agents, to enter onto the Station at any time to inspect the Station, to obtain samples of gasoline and other products, and to take pump and gasoline stick readings.

\* \* \*

"Standards 27. Lessee shall operate the Station in accordance with Company's standards of quality, appearance, cleanliness and service, provide adequate illumination for the Station and shall provide qualified and neatly dressed attendants to render first class service to customers.

\* \* \*

"RIDER to Lessee Supply Contract made March 16, 1993 between Getty Petroleum Corp. (the 'Company') and Wagar Ahmad ('Lessee').

"Commission 51. Company agrees to pay to the Lessee a commission at the rate set forth in the table below for each gallon of 'Getty' gasoline sold through the Company's marketing equipment during each calendar month:

| Range of Gallons | Cents Per Gallon |
| --- | --- |
| all gallons | $.065 |

"Lessee will invoice Company on the first business day of each week, setting forth the gallonage sold (on a gallons-per-day basis by grade) and commission earned during the previous week. Lessee shall also supply pump readings showing dollar and gallonage amounts and inventory reconciliation. Company shall pay to Lessee the commission earned within 14 days of receipt of invoice.

"The commission is Lessee's sole remuneration for the services to be provided hereunder and Lessee shall not receive any other compensation or reimbursement, unless approved in writing by Company. . . .

"Inventory & Revenue Responsibility 53. Lessee agrees to be responsible for the inventory belonging to the Company and for the collection of all monies for the sale of sold inventory. Cash receipts for sale of all products shall be deposited in station drop safes according to Company procedures. Lessee shall be trustee and custodian of Company funds and shall make adequate provisions for turning such funds over to the Company . . . .

\* \* \*

"Title to Proceeds and Products 55. All income and accounts receivable arising from the sale of Company products shall be and remain the property of Company. It is understood that Company shall retain title to all such products delivered by or for Company to custody of Lessee for the account of Company and that title to products shall remain in Company until sold to Company's customers. Company will not furnish a petty cash fund for the operation of the facility."

Although the agreements did provide that the defendants were responsible for additional rent if they did not sell a minimum gallonage,[11] the defendants did not bear the burden of marketplace risk that is indicative of an independent business operator. Notwithstanding the changing price of motor fuel, the defendants were to receive their commission in a fixed amount for overseeing the pumping of the gasoline and for collecting the sale price from the customers. The defendants' commission was to be remitted by the plaintiff upon the submission of a weekly invoice. The defendants' compensation was not affected by the rise and fall in the market price of motor fuel that is indicative of the risk that is assumed by an independent business operator. See *Simpson* v. *Union Oil Co.*, 377 U.S. 13, 20, 84 S. Ct. 1051, 12 L. Ed. 2d 98 (1964).

Because the plaintiff was selling its own gasoline, with the defendants acting as commission agents to facilitate the exchange, we conclude that there was insufficient evidence to establish that the defendants had any entrepreneurial responsibility as to the sale of gasoline or the gasoline itself. While it may be that the defendants assumed entrepreneurial responsibility for the convenience stores that they operated at the premises, the only goods sold under the plaintiff's trademark were the plaintiff's gasoline, motor oil and other promotional items. See footnote 6 of this opinion. The defendants were functioning as service station managers responsible for seeing that the gasoline was sold and that payments were collected and forwarded to the plaintiff. Because the defendants did not own the gaso-

---

[11] The lease provided that the defendants would pay additional monthly rent of six cents per gallon for every gallon of gasoline less than the monthly minimum number of gallons to be sold. Although this additional rent might represent some risk, it does not represent a substantial marketplace risk linked to the fluctuations in the price of gasoline in the market. It is, rather, a clause in the contract to ensure that the defendants devote their efforts to pump a minimum quantity of the plaintiff's gasoline.

line or assume any substantial market risk in its sale, we conclude that they were not retailers in the business of selling gasoline as independent business operators. They were rather, as the court in *Automatic Comfort Corp.* v. *D & R Service, Inc.*, supra, 627 F. Sup. 786, stated, the "temporary custodian[s] of the gasoline, the caretaker[s] of the property, the cashier[s], all as part of [the] plaintiff's business." Because the defendants were not engaged in the business of offering, selling or distributing the gasoline, they were not franchisees under the general franchise act.[12]

Our determination is consistent with the purpose of the general franchise act, which is to protect independent business persons who have assumed an entrepreneurial role and who face the risk of the market. "We believe our State must assume a minimum level of protection to the small business man from a corporation which suddenly and capriciously snatches away his livelihood," and to small business persons "who have literally sunk their life savings into their businesses and then have seen their investments and their labors go down the drain." 15 H.R. Proc., Pt. 7, 1972 Sess., p. 2777, remarks of Representative Albert R. Webber. One of the principal remedial provisions of the general franchise act is the requirement that upon termination of the franchise, the franchisor must fairly and reasonably compensate the franchisee for inventory, supplies, equipment and furnishings purchased from the franchisor. General Statutes § 42-133f (c). This provision is further evidence of the legislative intent to protect business persons who, unlike the defendants, have been required to make substantial investment in components of an entrepreneurial business.

[12] Although the Lessee Supply Contracts attach the label "franchise" to the arrangements between the plaintiff and Ahmad, the parties' characterizations, under the circumstances of this case, are not determinative of the issues before this court. See *Automatic Comfort Corp.* v. *D & R Service, Inc.*, 620 F. Sup. 1349, 1354 (D. Conn. 1985).

Finding that franchises existed in these cases would blur the distinction between the entrepreneur and one who acts as an agent for another in selling a product. Accordingly, we conclude that the trial court incorrectly accorded the defendants the protection afforded a franchisee under § 42-133f.

The judgments are reversed and the cases are remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.