******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRUCE K. JALBERT ET AL. *v.* LAWRENCE R.
MULLIGAN ET AL.
(AC 35824)

Keller, Mullins and Schaller, Js.

*Argued May 21—officially released September 23, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, Shapiro, J.)

*Lawrence R. Mulligan*, self-represented, with whom
appeared *Paul E. Pollock* and *Dov Braunstein*, for the
appellant (named defendant).

*Benjamin M. Wattenmaker*, with whom, on the brief,
was *John M. Wolfson*, for the appellees (plaintiffs).

*Opinion*

KELLER, J. The defendant, Lawrence R. Mulligan, appeals from the judgment, rendered after a court trial, in favor of the plaintiffs, Bruce K. Jalbert and Pamela D. Jalbert.[1] On appeal, he challenges as clearly erroneous the trial court's findings as to (1) the assumption of a defense by Chicago Title Insurance Company (Chicago Title), (2) the barter agreement between the parties, and (3) his retention of $135,000 for legal fees allegedly incurred. He further claims that (4) the barter agreement between the parties is unenforceable, (5) a pleading deficiency bars recovery under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. (CUTPA), and (6) the court's erroneous findings of fact "result in clearly erroneous judgments against" him. We affirm the judgment of the trial court.

The following relevant findings of fact are set forth in the court's detailed memorandum of decision. "The [plaintiffs] are husband and wife. Pamela Jalbert did not graduate from high school and received a [general equivalency diploma]. Bruce Jalbert is a carpenter. The defendant acted as the plaintiffs' attorney between 1995 and 2008, [working on matters that included] real estate transactions. He represented them when they purchased their home at 35 Tolstoy Lane in Southbury for $295,000 in 2004. On the defendant's recommendation, they purchased title insurance from [Chicago Title]. The defendant also handled Bruce Jalbert's father's estate, including probate work and real estate transactions.

"The defendant was a close personal friend of the [plaintiffs]. He testified that he and his wife and the [plaintiffs] 'were about as close as you would deem family.' . . . During a ten year period, they had dinner together, socialized at one another's homes, and traveled together. When they purchased their home in 2004, the [plaintiffs] were aware that a neighboring owner, Jean Elin, of 39 Tolstoy Lane, had an easement for a right-of-way over their land. . . . Pamela Jalbert described it as a passway to a summer cottage, to be used for three weeks to three months out of the year, which was not to be widened or maintained. In 2005, after friends of the [plaintiffs] learned of an issue concerning rights to use Tolstoy Lane and, as a result, decided not to purchase 39 Tolstoy Lane, the [plaintiffs] asked the defendant to represent them concerning the easement issue.

"To compensate the defendant for his legal services, the [plaintiffs] and the defendant agreed to a barter system, contingent on whether Chicago Title provided representation to the [plaintiffs]. They agreed that if Chicago Title did not provide representation, the parties would exchange Bruce Jalbert's construction work for the defendant's legal services. If Chicago Title did provide representation, then the defendant would pay for

Bruce Jalbert's work. This agreement was not put in writing.

"Between 2005 and 2007, Bruce Jalbert worked on several renovation projects for the defendant, at properties located in Connecticut, New York and Rhode Island. The undisputed value thereof was $84,750. . . .

"Elin sold 39 Tolstoy Lane to Warren Enterprises, LLC (Warren Enterprises), in May, 2006. Warren Enterprises sued the [plaintiffs] in November, 2006, seeking access to Tolstoy Lane over the plaintiffs' property (Warren Enterprises litigation). . . . After receiving the suit papers, the defendant contacted Chicago Title and then told Pamela Jalbert that Chicago Title's claims representative informed [him] that Chicago Title was not going to provide representation for the [plaintiffs]. As a result, Mrs. Jalbert asked the defendant to represent them. He represented them at court appearances in December, 2006, and February, 2007.

"After the second appearance in February, 2007, the defendant informed the plaintiffs that Chicago Title had hired Attorney Neil Marcus of the law firm of Cohen & Wolf, P.C., 'to help him.' . . . In fact, by letter dated March 8, 2007 . . . Chicago Title informed the defendant that it had retained Marcus to defend the [plaintiffs], and that it would not be responsible for any fees or expenses of any other counsel. Marcus filed an appearance for the [plaintiffs] in the Warren Enterprises litigation, in lieu of the defendant, in March, 2007, to defend the [plaintiffs] against all counts of the complaint in that matter. . . . The defendant did not provide Chicago Title's letter to the [plaintiffs], and they saw it only after the Warren Enterprises litigation was settled in April, 2008, and after they had commenced suit against the defendant in this matter.

"In May, 2007, the defendant asked the plaintiffs for $85,000 from Bruce Jalbert's father's trust (the trust), in order to show Chicago Title that the plaintiffs had paid the defendant for his work. According to the defendant, he could not show Chicago Title that he had been paid by Bruce Jalbert's work.[2] The defendant agreed to hold the $85,000 in an escrow account, to be returned to the trust after the settlement of the Warren Enterprises litigation. . . . [T]he trust provided the $85,000, which the [plaintiffs] provided to the defendant by personal check. . . . The defendant did not return these funds.

"Prior to Marcus' appearance, the defendant filed no pleadings in the Warren Enterprises litigation. Marcus filed pleadings after he appeared. Marcus then worked with opposing counsel, who also had been retained by a title insurance company, to settle the Warren Enterprises litigation. No depositions were taken and no motion practice occurred. As part of the settlement, Warren Enterprises received a parcel on the north side of the [plaintiffs'] property for use as a driveway, and

the [plaintiffs] received a parcel as a buffer zone so that their neighbors could not build near the [plaintiffs'] house. Also, $50,000 each was paid by Chicago Title and First American Title Insurance Company, Warren Enterprises' title company. [A total of $100,000 in settlement funds was] deposited in the defendant's client funds account. . . . [T]he defendant [retained] $50,000 from the settlement." (Citations omitted; footnote added.)

Approximately two weeks after the Warren Enterprises litigation settled, Pamela Jalbert asked the defendant to return the $85,000 from the escrow account. The defendant refused to do so, and this civil action ensued. The operative complaint, the plaintiffs' December 11, 2012 fourth revised complaint, contains five counts alleging conversion, statutory theft in violation of General Statutes § 52-564, violation of CUTPA, fraud and larceny by false pretenses. In their prayer for relief, the plaintiffs requested, inter alia, monetary damages, treble damages pursuant to the statutory theft count, prejudgment interest, costs and reasonable attorney's fees. The matter was tried before the court over the course of two days in March, 2013, during which all parties testified.

In its memorandum of decision, the court began its discussion by observing that "[t]he resolution of this matter involves the court's assessments of credibility and the fiduciary nature of the attorney-client relationship." Throughout its decision, the court expressly credited the testimony of the plaintiffs. By contrast, the court did not find the defendant's testimony to be credible, detailing numerous assertions and explanations that the court found to be unpersuasive or lacking in credibility. The court ultimately ruled in favor of the plaintiffs on all but the fraud count, concluding in relevant part that "[t]he evidence is . . . clear and convincing that the defendant intentionally and wrongfully took and withheld $135,000 from the plaintiffs. The defendant intentionally misled them concerning the $85,000 payment from the trust. The defendant intentionally misled the plaintiffs into believing that his services were needed to defend them in the Warren Enterprises litigation, and that he was entitled to be paid therefor, causing them also to agree that he would receive $50,000 from the settlement. He intentionally deprived them of those funds as well." The court further found that "[t]he evidence before the court shows that the plaintiffs, who were not as well educated as the defendant, an attorney, were misled by the defendant, who, at the time of the events at issue, was their friend, attorney and fiduciary. It is evident that he misled them to believe that Chicago Title was not providing a defense and that he had expended vast hours on their behalf in their defense . . . . The defendant never paid for Bruce Jalbert's construction services. As a result, the plaintiffs suffered an additional ascertainable loss of $84,750. . . . This con-

duct . . . was unfair, immoral, unethical, oppressive, and unscrupulous." (Citation omitted.)

The court awarded the plaintiffs a total of $746,821.11 in damages, which included treble damages on the statutory theft count pursuant to § 52-564, treble prejudgment interest pursuant to General Statutes §§ 37-3a and 52-564, and CUTPA damages. The court further determined that an award of attorney's fees was warranted in light of the CUTPA violation, and thus granted the plaintiffs a period of fifteen days in which to file an affidavit of attorney's fees and expenses. From that judgment, the defendant appealed to this court.[3]

On appeal, the defendant primarily challenges various factual findings rendered by the court. The standard of review governing such claims is well established. "[I]t is axiomatic that [t]he trial court's [factual] findings are binding upon [an appellate] court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 359, 880 A.2d 872 (2005). With that standard in mind, we turn to the defendant's claims.

I

The defendant challenges as clearly erroneous certain findings pertaining to Chicago Title's assumption of a defense on behalf of the plaintiffs in the Warren Enterprises litigation. Specifically, the defendant claims that the court erroneously found that he deceived the plaintiffs into believing that Chicago Title had declined to furnish such a defense, particularly when, he alleges, Marcus advised them to the contrary. For two distinct reasons, his claims fail.

First, our appellate courts repeatedly have recognized that "[w]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quota-

tion marks omitted.) *Russell* v. *Russell*, 91 Conn. App. 619, 634–35, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005). The defendant's appellate brief fails to cite to any legal authority in regard to these claims. Rather, his brief consists entirely of bald assertions unaccompanied by substantive analysis thereof. As a result, the defendant has not adequately briefed those issues.

Second, even assuming the claims were adequately briefed, the record before us contains ample evidence substantiating the court's findings. At trial, Pamela Jalbert was asked whether the plaintiffs were notified that Chicago Title had agreed to represent them in the Warren Enterprises litigation. She testified that shortly after she was served with legal process in the Warren Enterprises litigation, the defendant informed her that he had contacted Chicago Title and that Chicago Title responded that "they weren't going to represent us."[4] Later in her testimony, the following colloquy ensued:

"[The Plaintiffs' Counsel]: . . . [D]id you know that in March of 2007 [the defendant] had received . . . a letter from Chicago Title that said that Chicago Title was hiring [the law firm of] Cohen & Wolf to defend you?

"[Pamela Jalbert]: No. [The defendant] kept telling us that our title company was not representing us. . . .

"[The Plaintiffs' Counsel]: . . . [W]hat was your understanding regarding Chicago Title's part of this case?

"[Pamela Jalbert]: That they were not representing us. That they had hired Neil Marcus to help [the defendant] and that the title company was not representing us. I did not find out that they were representing us until after we sued [the defendant], after we started this lawsuit. Then, subsequently, when he turned over his files, we found out that . . . they were representing us. But [the defendant] kept telling us from day one up until the end, even when we settled, he kept telling us the title company wasn't representing us [and that] [w]e need to sue them for failure to represent."

In addition, the March 8, 2007 letter from Chicago Title to the defendant, in which it formally notified the defendant that it would be providing a defense on behalf of the plaintiffs, was admitted into evidence at trial. Pamela Jalbert testified that the defendant never showed her and her husband that letter or conveyed its substance to them. She further testified that "if we had known that Chicago Title was representing us from day one, we would have had no reason to hire [the defendant]. There would have been no barter agreement, there wouldn't have been any exchange of money because Chicago Title would have been representing us, so we would have had representation. There would have been no need for any of it. . . . [W]e wouldn't have had to have [the defendant] as our

attorney."

"It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26, 807 A.2d 955 (2002). As trier of fact, the court was "free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *DiVito* v. *DiVito*, 77 Conn. App. 124, 138, 822 A.2d 294, cert. denied, 264 Conn. 921, 828 A.2d 617 (2003). The court thus was entitled to credit the aforementioned testimony of Pamela Jalbert.

The record also contains evidence belying the defendant's assertion that "all the evidence commands the conclusion" that Marcus had advised the plaintiffs that Chicago Title was providing a defense on their behalf in lieu of the defendant. The court thoughtfully considered, and rejected, this argument, finding it unpersuasive. We concur. Marcus testified that, after filing an appearance on behalf of the plaintiffs, the defendant "requested that I communicate with the [plaintiffs] through him, and that . . . if we needed to meet with the [plaintiffs], he would set up the appointment, he would attend any of our meetings. Essentially, he was asking that he be the filter between the [plaintiffs] and me." Pamela Jalbert similarly testified that, after informing the plaintiffs that Marcus had been retained to "help him" with their defense, the defendant "told us not to speak with" Marcus. As a result, the vast majority of communications between Marcus and the plaintiffs "went through" the defendant. Marcus further testified that "[a]s we were reaching the final throes of the settlement agreement, it became apparent to me that the communications were not working because I was getting a response allegedly from the [plaintiffs], which was coming through [the defendant], that didn't make sense . . . because it was not, in my opinion at the time, in the [plaintiffs'] best interest . . . . [A]t some point I realized that I had to talk directly to the [plaintiffs], and that was my eye-opener, that I realized that the communications weren't working . . . . I spoke to them directly . . . and at that point I realized that they had been somewhat confused. They really, at that point, felt that [the defendant] was representing them . . . ." Marcus' testimony substantiates the court's finding that the plaintiffs were not aware that Chicago Title had assumed their defense in lieu of the defendant. We thus cannot say that the court's finding was clearly erroneous.[5]

II

The defendant also contests the court's findings with respect to the barter agreement between the parties. In its memorandum of decision, the court found in relevant part: "The defendant acknowledges that he had a barter

agreement with Bruce Jalbert. . . . However, he disagrees with the plaintiffs' contentions as to its terms and whether it continued until the settlement of the Warren Enterprises litigation. Under the barter agreement, the defendant agreed to pay for Bruce Jalbert's construction services if Chicago Title provided a defense to the Jalberts. . . . [T]he defendant misled the plaintiffs so that they were not aware that Marcus was defending them on behalf of Chicago Title. The court credits the plaintiffs' contentions that the barter agreement involved an exchange of services based on hours expended, without, as contended by the defendant, adjustment by an hourly rate differential which recognized that the defendant's hourly rates were considerably higher than Bruce Jalbert's hourly rates. This was an arrangement between close friends, where the defendant previously had represented the plaintiffs in the purchase of their home, when they obtained the title insurance recommended by the defendant." (Citations omitted.)

The record before us contains evidence substantiating those findings. In particular, Pamela Jalbert testified at trial that her husband "was already working for [the defendant] at his Meadow Road house in Woodbury. And [the defendant] was in our kitchen and he said, I came up with an idea, let's—since you're already working for me, Bruce, why don't we work out a barter system. That if the title company represents you, all right. Then if [the title company] does not represent you, we'll do service for service, legal work for carpentry work. If they do represent you, then Bruce would get paid, [the defendant] would pay Bruce for all the work that he did. So, that was the barter agreement that they came up with." Bruce Jalbert similarly testified at trial that he never provided any estimates to the defendant for the various work he performed at the defendant's properties "[b]ecause of the nature of our barter agreement, it was strictly a service for service deal. There was never any question about whose service was worth more or whose was worth less. It was, I do this for you, you do this for me."

The gist of the defendant's claim is that he offered evidence that conflicted with that offered by the plaintiffs, which the court should have credited.[6] His argument reflects a fundamental misunderstanding of the applicable standard by which we review his claim. Under the clearly erroneous standard of review, an appellate tribunal does not weigh the quantum of evidence submitted; it simply inquires as to whether there is any evidence in the record to support a given finding, or whether the tribunal otherwise is definitely and firmly convinced that a mistake has been made. See *Getty Petroleum Marketing, Inc.* v. *Ahmad*, 253 Conn. 806, 811, 757 A.2d 494 (2000).

At its essence, the defendant's claim asks this court

to engage in an independent review of the credibility of the respective parties. That we cannot do. "[I]t is well established that the evaluation of a witness' testimony and credibility are wholly within the province of the trier of fact. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Citation omitted; internal quotation marks omitted.) *Schoenborn* v. *Schoenborn*, 144 Conn. App. 846, 851, 74 A.3d 482 (2013). For that reason, "[i]In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Murtha* v. *Hartford*, 303 Conn. 1, 13, 35 A.3d 177 (2011).

Although the defendant offered conflicting documentary and testimonial evidence at trial, the memorandum of decision plainly indicates that the court rejected that evidence and instead chose to credit that presented by the plaintiffs. Such is the exclusive prerogative of the trier of fact, with which this court will not interfere on appeal. See *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 728, 941 A.2d 309 (2008) (appellate court must defer to trier of fact's assessment of credibility); *Klein* v. *Chatfield*, 166 Conn. 76, 80, 347 A.2d 58 (1974) ("trier is privileged to adopt whatever testimony it reasonably believes to be credible"); *Talton* v. *Warden*, 33 Conn. App. 171, 179, 634 A.2d 912 (1993) ("[w]e cannot . . . pass on the credibility of a witness"), aff'd, 231 Conn. 274, 648 A.2d 876 (1994). Because there is supporting evidence in the record and we are not convinced that a mistake was made, the court's findings with respect to the barter agreement between the parties are not clearly erroneous.

### III

The defendant also challenges the court's findings with respect to his retention of $135,000 for legal services he allegedly provided the plaintiffs in the Warren Enterprises litigation. In its memorandum of decision, the court found, inter alia, that (1) the barter agreement "involved an exchange of services based on hours expended, without . . . adjustment by an hourly rate differential"; (2) under the barter agreement, the defendant would be compensated for his work in the Warren Enterprises litigation, by way of construction services, only if Chicago Title declined to provide a defense to the plaintiffs; and (3) "the defendant converted the $85,000 which he [obtained] from the trust [and] also converted

the $50,000 [he retained] from the Warren Enterprises litigation settlement." We already have concluded in part II of this opinion that the court's findings with respect to the barter agreement are not clearly erroneous. As a result, given Chicago Title's representation of the plaintiffs in the Warren Enterprises litigation, the court reasonably found that the defendant was not entitled to any compensation thereunder.[7]

The defendant nonetheless maintains that the court improperly found that he was not entitled to any compensation for work performed prior to Chicago Title's assumption of a defense. Apart from the terms of the barter agreement, we note that the court also concluded that the defendant failed to provide credible evidence to establish that he was, in fact, entitled to such compensation. The court found the defendant's testimonial and documentary evidence regarding his legal fees to be wholly lacking in credibility. As it stated: "The defendant's credibility, including his statements made in documents related to billing, is undermined by his acknowledged backdating of a retainer agreement with the [plaintiffs]. In his testimony, the defendant stated that he prepared a retainer agreement for the [plaintiffs] to sign in March, 2007 . . . but dated it February, 2005, more than two years earlier. . . . He stated that he did so '[b]ecause I felt it would be helpful to have a memorialization of our agreement in the beginning of the file for purposes of our ultimate claim against Chicago Title.' . . . Although the document states that Bruce Jalbert signed it in February, 2005, the defendant testified that Bruce Jalbert signed it in March, 2007. . . . The defendant also testified that, at the time he wrote this letter, he knew that Chicago Title had provided a defense for the [plaintiffs]. . . . The letter stated, in its first sentence, 'Chicago Title may not provide you with a defense against the claims brought by Jean Elin to cross your property.' This letter also does not mention the barter agreement which was in effect when the defendant wrote it. . . . According to the defendant, he drafted the letter in March, 2007, to be correct as of February, 2005. His fabrication of the document undermines the defendant's credibility.

"Other examples of misleading documents created by the defendant also undermine his credibility and his arguments about being entitled to be paid for legal services. He prepared a letter addressed to the [plaintiffs], dated May 30, 2007, in which he stated that he 'and his paralegal combined have in excess of 460 hours at our regular rate per hour for my time and $55 dollars per hour for my paralegal's time resulting in a total more than $140,000 for my time and about $25,000 for paralegal time and expenses to date.' . . . In the next paragraph, the defendant stated that he and the [plaintiffs] had 'come to a resolution for a flat fee of $130,000 for all legal fees to date, and $25,000 for paralegal fees and expenses.' The last sentence of this letter states, 'I

look forward to receiving your first payment in this regard.' At trial, the defendant testified that his paralegal on the case was Pamela Jalbert. . . . Thus, the letter was a bill to the [plaintiffs], which included charging them for Pamela Jalbert's own work. In contradiction to his own letter, the defendant testified that '[i]t was not my intention that the [plaintiffs] would be paying my legal fees out-of-pocket at any time.' . . . The court does not credit the statement in the letter or the defendant's trial testimony that an agreement was reached for payment to the defendant of a flat fee.

"The misleading statements in his May 30, 2007 letter were followed five days later by the defendant's June 4, 2007 letter and statement of account to the [plaintiffs] for professional services from February 19, 2005, to February 12, 2007. . . . In the June 4, 2007 letter, the defendant stated, incredibly, that he reduced the total time reflected since the fees were escalating 'at a very rapid pace.' The statement again billed for paralegal time. In contrast to the May 30, 2007 letter, which billed for in excess of 460 hours of attorney and paralegal time, the June 4, 2007 statement billed for 877.75 hours of the defendant's time, an increase of over 410 hours. The defendant stated that he did not have contemporaneous time records to support either amount; instead, he leafed through the file and came up with a number. . . . The defendant's testimony that both numbers were 'reasonably accurate' . . . lacks credibility. Similarly lacking in credibility is the sheer amount of the bill, $209,445.97." (Citations omitted; emphasis omitted.)

In his reply brief, the defendant alleges that "all fees billed by and earned by him were earned prior to Chicago [Title] assuming [the] plaintiffs' defense, and no fees were billed nor any received after [it] assumed [that] defense in March, 2007 . . . ." (Citations omitted; emphasis omitted.) The court nevertheless found that "[t]he evidence . . . does not establish that the defendant provided legal services in connection with the Warren Enterprises litigation which were worth [the] payment of $85,000 [made by the plaintiffs from the trust]. The defendant did not engage in discovery, such as taking or defending depositions, or prepare witnesses, or prepare for trial, or represent the [plaintiffs] at trial. By comparison, Marcus, who represented the [plaintiffs] in the Warren Enterprises litigation for about one year, billed approximately $10,800 for his services. . . . The defendant's claimed legal work was unsupported by contemporaneous time records, and he acknowledged that it included an inordinate amount of time reviewing deeds. . . . The court is unpersuaded by his assertions about the value of and the extent of the legal work he claims to have performed."[8] (Citation omitted.) Those factual findings all are supported by the record before us. As such, they are not clearly erroneous.

## IV

Despite the fact that none of the causes of action contained in the plaintiffs' complaint sound in breach of contract, the defendant contends that the barter agreement is unenforceable because (1) "no consideration was given by [the plaintiffs] to [the] defendant" and (2) its terms were not definite and certain. That claim requires little discussion, as the defendant did not preserve it before the trial court. Our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise its claim before the trial court. See Practice Book § 5-2 ("[a]ny party intending to raise any question of law which may be the subject of an appeal must . . . state the question distinctly to the judicial authority"); see also Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). "We have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial and was ruled upon and decided by the court adversely to the appellant's claim." (Internal quotation marks omitted.) *McGuire* v. *McGuire*, 102 Conn. App. 79, 87, 924 A.2d 886 (2007). To review a claim advanced for the first time on appeal and not raised before the trial court amounts to a trial by ambuscade of the trial judge. *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 798, 967 A.2d 1 (2009). We therefore decline to afford review of this unpreserved contention.

## V

As best we can comprehend, the defendant also argues that the court improperly found a CUTPA violation stemming from his failure to pay for the construction services that Bruce Jalbert had rendered on his properties. Amidst a sea of abstract assertion set forth in part II of his appellate brief—which is titled, "The Trial Court Made Clearly Erroneous Findings that the Assumption of Defense by Chicago Was Relevant to Defendant's Receipt of Fees and that Plaintiff Was Not Aware of its Assumption"—comes a mere sentence regarding an alleged CUTPA pleading deficiency. The brief states: "Since even if the court had been correct [in awarding CUTPA damages], no such judgment could enter as there was no allegation or claim for carpentry fees set forth in the plaintiffs' complaint, the estimate [of construction costs] went unchallenged."

To the extent that the defendant submits that this sentence sets forth a distinct ground of appeal, it is the quintessence of inadequacy. The statement of issues makes no mention of that claim. The brief does not contain a separate heading regarding this point of contention, nor does it identify the applicable standard of review, in contravention of the mandates of Practice

Book § 67-4 (d). Further, the brief cites no legal authority to support the allegation contained therein.

"In Connecticut, our appellate courts do not presume error on the part of the trial court." *Brett Stone Painting & Maintenance, LLC* v. *New England Bank*, 143 Conn. App. 671, 681, 72 A.3d 1121 (2013). Rather, the burden rests with the appellant to demonstrate reversible error. *Brookfield* v. *Candlewood Shores Estates, Inc.*, 201 Conn. 1, 7, 513 A.2d 1218 (1986) ("[t]he burden is on the appellant to prove harmful error"); *Harlow* v. *Stickels*, 151 Conn. App. 204, 210,      A.3d      (2014) ("[a]n appellant bears the burden to show that there was error from which she appeals"). Such bald assertion as that set forth in the sentence previously quoted, divorced from any meaningful analysis or compliance with the strictures of our rules of practice, does not satisfy that burden.

VI

As a final matter, the defendant claims that the court's erroneous findings of fact "result in clearly erroneous judgments against" him. Once again, the defendant has failed to furnish a discussion of any legal authority whatsoever in support of his claim, which consists entirely of abstract assertion. His brief contains no application of facts to the elements of the various causes of action on which the court ruled in favor of the plaintiffs. See *Grasso* v. *Connecticut Hospice, Inc.*, 138 Conn. App. 759, 769, 54 A.3d 221 (2012). "We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 406, 1 A.3d 1238, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010). To the extent that the concluding portion of the defendant's appellate brief may be construed as anything but a summation of his prior points of contention, they do not merit further review.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although the operative complaint also named Renee T. Mulligan and Bastille Estates, LLC, as defendants, the plaintiffs withdrew their action with respect to those parties. Accordingly, we refer to Lawrence R. Mulligan as the defendant in this appeal.

Additionally, we note that, at oral argument, the defendant introduced himself as a self-represented party. The record nevertheless contains appearances on his behalf by the firms of Bai, Pollock, Blueweiss & Mulcahey, P.C., and Slavin, Stauffacher & Scott, LLC. The record reveals that approximately six months after this appeal was commenced, the defendant filed an appearance herein. That appearance states that it is in addition to an appearance already on file.

The record further indicates that although his counsel filed an appellate brief on his behalf on December 19, 2013, the defendant filed a motion for permission to file a substitute appellate brief on December 30, 2013. This

court granted that motion and the defendant thereafter filed a substitute appellate brief. That brief, as well as the reply brief filed by the defendant, is signed by the defendant alone.

[2] We reiterate that the court specifically found that the undisputed value of the construction work performed by Bruce Jalbert on the defendant's properties was $84,750.

[3] Following the commencement of this appeal, the plaintiffs filed a motion for attorney's fees accompanied by a detailed affidavit thereof, as well as a motion for additur seeking an award of offer of compromise interest pursuant to General Statutes § 52-192a. After a hearing, the court on August 29, 2013, granted both motions and modified its judgment to reflect a total amount of $821,664.92 in damages and $125,000 in attorney's fees awarded to the plaintiffs. The defendant did not amend his appeal to challenge any aspect of that modified award. In this appeal, the defendant likewise does not contest the court's calculation of damages in any manner.

[4] The defendant testified at trial that he learned that Chicago Title had hired counsel to represent the plaintiffs "[i]n September or October, 2006." The Warren Enterprises litigation commenced in November, 2006.

[5] We likewise disagree with the defendant that the issue of whether Chicago Title would defend the plaintiffs in the Warren Enterprises litigation was irrelevant to the court's consideration of his receipt of legal fees. The court specifically found that the plaintiffs had asked him to represent them in the Warren Enterprises litigation as a direct result of his false representation that a claims representative of Chicago Title had informed him that Chicago Title would not provide a defense on their behalf. That finding is supported by the record before us. As Pamela Jalbert testified at trial, "if we had known that Chicago Title was representing us from day one, we would have had no reason to hire [the defendant]. . . . [W]e wouldn't have had to have [the defendant] as our attorney." In addition, the court found that when Marcus commenced his representation of the plaintiffs, the defendant falsely advised them that Chicago Title had hired Marcus "to help him." That representation by the defendant is contrary to the undisputed evidence that Marcus had filed an appearance on their behalf in lieu of the defendant and that Chicago Title's March 8, 2007 letter to the defendant specifically apprised the defendant that "[p]ursuant to the terms and conditions of the policy . . . we have retained Neil Marcus, Esq. of the law firm of Cohen & Wolf, P.C., to defend the interest of the [plaintiffs] with respect to the challenge to title as insured. We will not be responsible for any fees or expenses of any other counsel. Neil Marcus, Esq. is primarily responsible for handling the matter . . . ." In light of the foregoing, we conclude that the court properly considered Chicago Title's assumption of a defense in evaluating the propriety of the defendant's receipt of legal fees in the present case.

[6] In his reply brief, the defendant acknowledges the central tenets of the clearly erroneous standard of review, noting that findings of fact "must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did." (Internal quotation marks omitted.) The defendant then submits: "The reverse is also true. If the trier of fact could not have found as he did because the weight of the evidence prohibiting the conclusion is so great as to alert the appellate court [that] an error has occurred, the finding must be reversed." He provides no authority for his novel assertion that application of the clearly erroneous standard compels consideration of "the weight of the evidence," nor can we uncover any under Connecticut law.

[7] Indeed, the defendant in his reply brief acknowledges that this court's resolution of the barter agreement issue "will determine the result of this appeal."

[8] As but one example, we note that the defendant testified at trial that he spent 312 hours reviewing deeds on behalf of the plaintiffs in 2005—the year *before* Warren Enterprises filed suit against the plaintiffs. The defendant further testified that he spent 758 hours reviewing deeds on behalf of the plaintiffs in 2006.